**PAECO, INC., Appellant in No. 76–1495,**

v.

**APPLIED MOLDINGS, INC. and Michael R. Sigal, Appellants in No. 76–1496,**

v.

**ARLEN REALTY AND DEVELOPMENT CORP.**

**Nos. 76–1495, 76–1496.**

United States Court of Appeals, Third Circuit.

Argued Feb. 24, 1977.

Decided June 8, 1977.

As Amended Aug. 19, 1977.

Michael D. Bull, May, Grove, Stork & Blakinger, Lancaster, Pa., James E. Siegel, Henry A. Marzullo, Jr., Lackenbach, Lilling & Siegel, New York City, for appellant in No. 76–1495 and as cross-appellee in No. 76–1496.

William P. Cole, Philadelphia, Pa., Richard O. Church, Reading, Pa., Synnestvedt & Lechner, Philadelphia, Pa., for appellees in No. 76–1495 and as cross-appellants in No. 76–1496.

Before GIBBONS, FORMAN and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Plaintiff, Paeco, Inc., is the assignee of U.S. Letters Patent No. 3,561,181 issued to Stephen Bassett for an article of manufacture described as "replica wooden beams." Although molded entirely out of plastic, the beams have the appearance of real wood and can be used for decorative, although not structural, purposes in place of the more costly natural material.

Paeco brought an action in the United States District Court for the Eastern District of Pennsylvania for patent infringement and unfair competition against defendants, Applied Moldings, Inc., and Michael R. Sigal, its president, (hereinafter referred to collectively as "AMI"). The defendants denied infringement and counterclaimed for a declaration that the patent was invalid and for damages resulting from Paeco's alleged violations of the Clayton and Sherman Antitrust Acts.

In determining whether to grant Paeco an injunction against further infringement,

the district court, Troutman, J., severed the issues of damages and antitrust violations and tried the issues of validity and infringement.[1] In two thorough and scholarly opinions,[2] Judge Troutman concluded that Claim 1 of the patent was invalid under 35 U.S.C. § 102(b) (1970),[3] that Claims 2 and 3 were invalid under 35 U.S.C. § 102(a) and (b) (1970) and also under 35 U.S.C. § 103, and that Claims 4 and 5 were not infringed. Accordingly, the district court denied Paeco's request for injunctive relief. Although holding that AMI had failed to prove by clear and convincing evidence that Paeco had procured the patent through fraud on the patent office, the district court nevertheless concluded that the case was "exceptional" under 35 U.S.C. § 285 (1970) entitling AMI to reasonable attorney fees. Both Paeco and AMI have filed appeals to this court.

For reasons discussed hereafter, we have concluded that our sole source of jurisdiction is 28 U.S.C. § 1292(a)(1) and that our review is therefore directed to those issues bearing on the district court's denial of injunctive relief.

### I. CLAIM 1

Claim 1 of the patent reads as follows:

1. Replica wooden beams fabricated entirely of molded foam plastic material having the characteristics of rigid urethane foam comprising portions thereof molded to present the appearance of fasteners utilized to secure the replica beams with a surface or with similar replica beams.

The district court held Claim 1 invalid under § 102(b) and Paeco appeals from that holding.

Section 102(b)[4] establishes "novelty" as a prerequisite to a patent. If the invention described in a patent claim was in public use or on sale or described in a printed publication more than one year prior to the date of application for the patent,[5] the invention is said to lack "novelty" and the claim is invalid.

■ The learned district judge accurately stated the law concerning invalidity under § 102(b): Every patent comes into court clothed with a presumption of validity, 35 U.S.C. § 282 (1970); and the party challenging the validity of a patent bears a heavy burden of demonstrating by clear and convincing proof a prior use or sale of the patented invention or the patent's deficiency in some other respect. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 70 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Once the party asserting invalidity has convincingly proven the prior use or sale, however, the burden shifts to the patentee to prove that any prior use, sale, or printed publication was for experimental, not commercial, purposes. *Azoplate Corp. v. Silverlith, Inc.*, 367 F.Supp. 711 (D.Del.), *aff'd*, 506 F.2d 1050 (3d Cir.), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

Applying these principles to the instant case, the district court found that prior to

---

1. AMI eventually stipulated that its replica beams infringed Claims 1, 2 and 3 of the patent if the patent were valid.

2. The longer and more important of the opinions regrettably has not been reported. The shorter opinion is reported at 70 F.R.D. 490 (E.D. Pa.1976).

3. The district court also indicated in its order that Claim 1 was invalid under § 102(a) but the accompanying opinion contains no discussion of this issue. Since the facts so well set forth by the court would not seem to support the conclusion that Claim 1 is invalid under § 102(a), we believe that the reference to that subsection in the district court order was a

mistake. Accordingly, we must reverse this aspect of the order.

4. Section 102(b) provides:
   A person shall be entitled to a patent unless—
   (b) . . . the invention was patented or described in a printed publication in this or a foreign country or in public use or sale in this country more than one year prior to the date of the application for patent in the United States . . . .

5. We will follow the usage of the district court and refer to August 16, 1967, one year prior to the date of Paeco's application to the patent office, as the "critical date."

the critical date, Paeco itself sold replica wooden "Colony" beams substantially identical to those described in Claim 1,[6] and that the sale of these beams was commercially, not experimentally, motivated. Accordingly, Claim 1 was adjudged invalid.

## A. *Prior Use or Sale*

■ The controversy concerning the Colony beams, in this court as in the district court, centers on the characterization of the protuberances randomly spaced along the sides at the top of each Colony beam giving the appearance of somehow connecting or affixing the beam to the ceiling. Paeco concedes that it sold Colony beams prior to the critical date and that the beams featured protuberances along their sides. The question is whether these protuberances were substantially identical to those described as follows in Claim 1:

1. Replica wooden beams fabricated entirely of molded foam plastic material . . . comprising portions thereof molded to present the appearance of fasteners utilized to secure the replica beams with a surface or with similar replica beams.

To prove the substantial identity between the protuberances of the Colony beam and those described in Claim 1, AMI relied first on the following explanatory language from the patent specification:

[T]he replica beam or panels may be molded or fabricated to additionally represent or provide replicas of fastening means, such as bolts, pegs, dowels, or the like, particularly adjacent the edges or ends therewith, as would ordinarily be utilized to secure the wooden beams with a surface or with each other.

Secondly, AMI presented evidence showing that the Colony beam protuberances were characterized as "pegs" on Paeco's advertising display boards and in at least one inter-office daily report prepared by Paeco's president. AMI also used scholarly books on the history of barn architecture to show that peg-shaped pieces of wood were sometimes employed to fasten beams to ceilings. Based on this evidence, AMI argued that the protuberances of the Colony beams as well as the beams themselves fit well within the language of and the specification explaining the Claim.

Paeco attempted to counter AMI's argument with testimony by Bassett, the patentee, that the terms "edges" and "ends" in the specification were intended by him to denote a location not along the side of the beams but instead at either end of a given beam. Bassett testified that he had envisioned a pattern of short beam segments joined end-to-end or intersecting on a ceiling to create an integrated beamed ceiling system. The protuberances described in Claim 1 and in the specifications, according to Bassett, were intended to give the appearance of fasteners which joined one beam segment to the next in such an integrated system of beams. As such, Bassett reasoned, the protuberances could be located only at the ends of beams, not along the side of the beams where the Colony beam "pegs" were placed. Paeco presses these same arguments on appeal, stressing Bassett's concept of a beamed ceiling system with molded protuberances at the end of each beam designed to give the appearance of fastening one beam to the next in tandem or at right angles.

Interesting as Bassett's idea may be, we agree with the district court that given the words of the Claim, it is completely irrelevant. Paeco's argument is premised entirely on Bassett's concept of a beamed ceiling system. We are told that if we picture how beams would be used in such a system, we will quickly appreciate why the protuberances described in Claim 1 must be located on the ends, not the sides, of the beam. Claim 1, however, contains not a single word describing or even hinting at a beamed ceiling system. In fact, the very

---

6. The district court held that Claim 1 was also invalid under section 102(b) because its elements were described in a printed publication more than one year prior to the date of applica-tion. Since we hold that Claim 1 is invalid under section 102(b) for another reason, we need not review this holding by the district court.

language of the Claim contradicts the contention advanced by Bassett and Paeco that the protuberances there described must be such as would appear to connect one beam with another. The words of the Claim are "fasteners utilized to secure the replica beams *with a surface or* with similar replica beams." (Emphasis added). It is not possible to read this phrase as exclusively describing fasteners which connect one beam to another; the use of the disjunctive word "or" serves as conclusive proof to the contrary.

Paeco cannot now be allowed to limit its claim in order to exclude the Colony beam from its reach. "[T]he claims measure the invention," *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908), and the patentee may not narrow his claims to meet the exigencies of litigation. *See Nichols v. Minnesota Mining and Mfg. Co.*, 109 F.2d 162, 165 (4th Cir. 1940). *See also Graver Tank Co. v. Linde Air Co.*, 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672 (1949); *McClain v. Ortmayer*, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800 (1891).

■ Where the language of a patent claim is clear, the court need not—and may not—go beyond the claim to the specification. *Noll v. O. M. Scott, Co.*, 467 F.2d 295, 298 (6th Cir. 1972), *cert. denied*, 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973); *Schmidinger v. Welsh*, 383 F.2d 455, 460 (3d Cir. 1967). But even if we were disposed to examine the specification, we would find only further refutation of Paeco's contentions. Rather than specifying that bolts or pegs are to be placed exclusively at the ends of the beams, the specification speaks of beams "molded . . . to . . . represent . . . bolts, pegs, dowels, or the like, *particularly* adjacent to edges *or* ends . . . ." (Emphasis added). The use of "particularly" implies that the bolts or pegs are unusually *but not always* to be located at the "edges or ends" of the beams. Moreover, "edges or ends" is in the disjunctive and the word "edges" is not inconsistent with placement of pegs along the "sides" of the beam. Finally, the words "*with a surface or with* each other" (emphasis added) in the specification, like the words of the Claim itself, contradict the contention that the fasteners must necessarily give the appearance of connecting one beam to another. Thus, even if we were to ignore the rule that the claim, not the specifications, measures the grant to the patentee, *Milcor v. George A. Fuller Co.*, 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942); *Schmidinger, supra* ; we find nothing in the specifications to limit Claim 1 as Paeco advocates.

## B. *Experimental Use*

■ Having determined that Colony beams were substantially identical to the beams described in Claim 1, we must now consider whether their sale prior to the critical date was justified under the "experimental use" doctrine. That doctrine allows an inventor a reasonable period of experimentation wherein he may perfect his ideas, provided that the inventor truly has utilized the public use or sale to that laudatory end, not as a competitive tool to exploit his invention and gain an advantage over others. *Koehring Co. v. Nat'l Automatic Tool Co.*, 362 F.2d 100, 103–04 (7th Cir. 1966).

■ In the case *sub judice*, the district court found that Paeco had failed to meet its burden of showing by clear and convincing evidence that the public sale of the Colony beam prior to the critical date was experimental in nature, motivated by a desire to perfect or improve the invention. We may disturb this finding of fact by the district court only if clearly erroneous. However, we find no clear error here. Indeed, the evidence points strongly to the conclusion that Paeco's sale of the Colony beam was almost entirely motivated by commercial considerations: Bassett testified that Paeco decided to sell the beams because it was in "a very bad financial condition; " Paeco management was greatly concerned with customer interest in the beams, with customer reaction to advertising display boards, and with proper pricing of the beams. An experiment it may well

have been, but an experiment in marketing, not in technological improvement.

## C. *Conclusion*

Since we have concluded that the sale of the Colony beams constituted a public use or sale of the product described in Claim 1 more than one year prior to the date of the application for the patent and that the public use or sale was not a *bona fide* "experimental use," we affirm the judgment of the district court declaring Claim 1 invalid under § 102(b).

## II. CLAIMS 2 AND 3

Claims 2 and 3 read as follows:

2. As an article of manufacture, replica wooden beams having the feel, appearance and stain characteristics of wood fabricated of rigid urethane foam molded to a mold having a volume less than the free rise volume of said urethane foam resin, the outer skin surface thereof being non-porous and dense, and a portion of said skin being removed to define an exposed porous surface whereby the easy mounting of said beam is facilitated, said beam stained to provide colorations corresponding to a wooden beam.

3. Article of manufacture defined in claim 2 comprising, in combination, a base portion and a pair of leg portions extending generally perpendicularly thereof to define a generally U-shaped cross section with the base and legs being adapted to be exposed with the edge portions of the legs being adapted to be mounted adjacent a surface to provide the appearance of the replica beam supporting the surface.

Claim 3 is dependent on Claim 2 in the sense that if Claim 2 is not valid, neither can Claim 3 be.

7. 38 U.S.C. § 102(a) provides:
   A person shall be entitled to a patent unless—
       (a) the invention was known or used by others in this country, or patented or describ-

The district court held that Claims 2 and 3 were invalid under both § 102(a) and § 102(b). We will review each asserted ground of invalidity in turn.

## A. *Anticipation*

Section 102(a)[7] renders a patent invalid if the invention was "anticipated" by the prior art. Anticipation occurs only when some single prior article, patent, or publication contained within its four corners every element of the claim in question; a patent is not anticipated when its elements are distributed among several prior publications or devices. *See Line Material Co. v. Brady Elec. Mfg. Co.*, 7 F.2d 48, 50 (2d Cir. 1925); *Philips Elec. and Pharmaceutical Industries Corp. v. Thermal and Elec. Industries, Inc.*, 450 F.2d 1164, 1169 (3d Cir. 1971). Furthermore, in order to invalidate a patent on grounds of anticipation, as on any other ground of invalidity, the party asserting the invalidity bears a heavy burden of demonstrating it by clear and convincing proof. *Aluminum Co. of America v. Amerola Product Corp.*, 552 F.2d 1020 (3d Cir., filed April 8, 1977); *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 548 F.2d 88 (3d Cir., 1977). For reasons which follow, we do not believe that AMI's proof on the issue of anticipation meets these exacting standards.

The district court's holding that a beam manufactured by Paul Fleck anticipated the invention described in Claim 2 was based both on the court's construction of certain problematic language in Claim 2 and on findings of fact concerning the physical characteristics of the Fleck beam, the date of its first manufacture, and the date on which Bassett invented the features of his beam which are described by Claim 2. Although Paeco disputes each and every finding of fact, our review of the record convinces us that each finding is supported by clear and convincing evidence. In its con-

struction of the language of Claim 2, however, we believe that the district court erred.

Of the several complex questions concerning the proper interpretation of Claim 2, one is dispositive. That is the question whether in this language—

replica wooden beams . . . fabricated of rigid urethane foam molded in a mold having a volume less than the free rise volume of said urethane foam resin . . .

the adjectival phrase "having a volume less than the free rise volume of said urethane foam resin" describes the "rigid urethane foam" *of* which the beam is made or the mold *in* which the beam is produced.

Paeco argues (1) that this adjectival phrase describes the mold, (2) that a mold can be said to have a finite volume only if the mold is closed, i. e., has a top to it, (3) that the Claim therefore teaches the required use of a closed mold, and (4) that the Fleck beam, not produced in a closed mold, did not anticipate Claim 2.

AMI, on the other hand, believes (1) that the adjectival phrase describes a property of the foam material which makes up a beam, (2) that the foam material of the Fleck beam did indeed have a volume less than the free rise volume of the foam out of which it was made, (3) that the Claim does not teach the mandatory use of a closed mold, and (4) that even though it was not made in a closed mold, the Fleck beam anticipated Claim 2. The district court found AMI's arguments more persuasive and held that "the language of the claim only teaches a *density* greater than the free rise volume, not the exclusive use of a closed mold." (Emphasis in original).

If our inquiry were limited to the words of the Claims themselves, we would regard the two readings of the adjective phrase in question as equally plausible. Supporting Paeco's reading is the placement of the phrase immediately after the word "mold" rather than after the word "foam" as well as the complete absence of the word "density," the one word which seems likely to have suggested itself if the language at issue had been intended to describe a property of the foam.

On the other hand, we cannot dispute AMI's observation that the phrase "a mold having a volume less than the free rise volume of said urethane foam resin" is a rather awkward way to specify "a closed mold" if that is what was meant. Nor can we deny that the sentence is so structed as to permit the construction advocated by AMI that the adjectival phrase in question refers only to the polyurethane foam of which the *beam* is made, not the mold.

Because the claim is capable of two interpretations, we are justified in looking behind the words of the claim to the specification and description of the invention for explication of the Claim's meaning. *See Carnegie Steel Co. v. Cambria Iron Co.,* 185 U.S. 403, 432, 22 S.Ct. 698, 46 L.Ed. 968 (1902). When we do so, we observe that the greater part of the specifications is devoted to describing the process by which the beam may be made, rather than the substance of the beam itself. Thus, it would not be surprising if the ambiguous language of the Claim were intended to refer to the mold, an aspect of the manufacturing process, rather than to the beam as a product. And our suspicion that the words may describe the process, not the product, is reinforced by the principle that even when a patent is for an article of manufacture, as Claim 2 is, it is the manufacturing process described by the claim which is of paramount importance. A patent granted on a product claim describing one process grants no monopoly as to identical products manufactured by a different process. *See Nat'l Carbon Co. v. Western Shade Cloth Co.,* 93 F.2d 94, 98 (7th Cir. 1937), *cert. denied,* 304 U.S. 570, 58 S.Ct. 1039, 82 L.Ed. 1535 (1938).

These considerations do not establish with any degree of certainty that the phrase in question describes the mold not the beam, but no such certainty is needed to uphold the claim. The construction which we suggest is at least reasonable, and we believe more probable than the contrary construction. We therefore are constrained to disagree with the district court that AMI

proved by clear and convincing evidence that Claim 2 is invalid under § 102(a) as anticipated by the Fleck beam.

### B. *Novelty*

The district court held Claims 2 and 3 invalid under § 102(b) for lack of novelty based on the sale of beams by Paeco prior to the critical date. We have previously discussed the broad outlines of § 102(b) in connection with Claim 1 but the application of § 102(b) to Claims 2 and 3 is somewhat more subtle.

AMI contends that Paeco's pre-critical date beams were identical to the beams described in Claims 2 and 3 except with respect to skin removal.[8] AMI further contends that the skin removal procedure described in Claim 2 was an obvious improvement over the pre-critical date beams.

■■■■ If both these contentions are correct, Claims 2 and 3 are invalid. When a claim incorporates an improvement over a product sold prior to the critical date, which product, except for the improvement, is identical to that described in the claim, the improvement itself must be non-obvious under § 103[9] or the whole claim is invalid. *See Frantz Mfg. Co. v. Phenix Mfg. Co.*, 457 F.2d 314 (7th Cir. 1972) (Stevens, J.); *Package Devices, Inc. v. Sun Ray Drug Co.*, 432 F.2d 272 (3d Cir. 1970). AMI's contention is that the removal of the skin of the Paeco beam sold prior to the critical date was in itself an obvious improvement and that Claim 2 is therefore invalid. Paeco admits that prior to the critical date it sold beams which, except for skin removal, were identical to those described in Claim 2, but insists that skin removal was not an obvious improvement. The question of Claim 2's validity under § 102(b) thus hinges on the determination whether skin removal was an obvious improvement to the pre-critical date beams within the meaning of § 103.

We have recently had occasion to explicate the law of obviousness under § 103:

The ultimate determination of patent validity is a conclusion of law reviewable for error, but the resolution of the obviousness issue depends on several basic factual inquiries reviewable under the "clearly erroneous" standard of Fed.R. Civ.P. 52(a). *See Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 280, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *cases cited in Flour City Architectural Metals v. Alpana Aluminum Products, Inc.*, 454 F.2d 98, 106 n.8 (8th Cir. 1972); *Philips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.*, 450 F.2d 1164, 1172 (3d Cir. 1971). In *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court enumerated the factual inquiries that underlie the determination of obviousness. First, the scope and content of the prior art are to be discerned; second, the differences between the prior art and the claims at issue are to be ascertained; and third, the level of ordinary skill in the art must be resolved. In addition, the Court said, "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness, these inquiries may have relevancy." *Id.* at 17–18, 86 S.Ct. at 694.

*Tokyo Shibaura Electric Co. v. Zenith Radio Corp., supra,* 548 F.2d at 93. The district

---

**8.** When the beam is extracted from the mold, a non-porous and dense skin has been formed on the beam's surface. Claim 2 teaches that "a portion of [the beam's] skin [should be] removed to define an exposed porous surface whereby the easy mounting of said beam is facilitated . . . ."

**9.** Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

court in the instant case undertook two of the *John Deere* inquiries and found essentially (1) that the prior art included patents for simulated wooden beams and for wall panels made out of foamed urethane, and (2) that Fleck, a witness at trial and the manufacturer of a replica wooden beam, was representative of a person having ordinary skill in the pertinent art of making urethane foam replica beams. In this context, of course, the difference between the prior art and the claimed invention had already been determined to be the removal of the outer skin to facilitate mounting the beam on a ceiling, so the need to make the third *John Deere* finding was obviated.

The evidence showed (1) that in the spring of 1967, Fleck himself had removed the skin of his beams, although not for the purpose of making it easier to glue the beams to a ceiling; and (2) that Paeco had previously experimented with various techniques of gluing its beams to the ceilings, and had met with indifferent success. The district court held that given this information as well as familiarity with prior patents, the idea of removing the skin of a urethane foam beam for the purpose of making it easier to glue the beam to the ceiling would have been obvious to a person with ordinary skill in the art. We agree.

It seems to us that there is nothing so remarkable in combining (1) the idea of gluing urethane foam beams to ceilings with (2) the knowledge that the skin of a urethane foam beam may be removed, to produce (3) the "invention" of removing the skin for the purpose of making the gluing easier. Not only Fleck, a disinterested witness, but also Bassett, the patentee himself—both of whom were persons actively working in the art of urethane foam beams—characterized the idea of skin removal for the purpose of making gluing easy as "obvious." Although their testimony might not be dispositive on the issue of how the problem would appear to a hypothetical person of ordinary skill in the art, the district court was nevertheless entitled to give their opinions great weight. When the relatively simple nature of the skin removal is considered together with this

testimony, the conclusion is inescapable that skin removal for the purpose of making gluing easier was an obvious invention within the meaning of § 103. It follows then, from our discussion above concerning the interplay of §§ 102(b) and 103, that we must affirm the district court's holding that Claims 2 and 3 are invalid under § 102(b).

## III. ATTORNEYS' FEES AND FRAUD ON THE PATENT OFFICE

In addition to ruling on the validity of Claims 1, 2 or 3, the district court also evaluated Paeco's conduct in prosecuting its patent. While concluding that Paeco's nondisclosure of certain prior art references did not constitute fraud on the patent office, the district court did find that Paeco's conduct in the prosecution of its patent was "unfair" and "inequitable." Based on this finding, the court determined that this case was "exceptional" within the meaning of 35 U.S.C. § 285 and that it would be "grossly unjust" to deny attorneys' fees to AMI. The order entered by the district court states, in part:

(4) This is an exceptional case under 35 U.S.C. § 285 and defendants are entitled to reasonable attorney fees, the amount thereof to be determined and established by agreement of counsel, affidavits submitted or further hearing.

Paeco has appealed from the district court's finding that it had engaged in inequitable and unfair conduct and from the above order awarding attorney fees. AMI has cross-appealed from the failure of the district court to grant AMI any relief other than attorneys' fees based on Paeco's alleged misconduct. Specifically, AMI contends that the district court also should have enjoined Paeco from asserting its patent defensively in the eventual trial of AMI's antitrust counterclaims.

Interesting as these issues may be we have no jurisdiction at present to consider any of them. The controlling rule as to our appellate jurisdiction was recently set forth by Judge Maris in *W. L. Gore & Associates*

*v. Carlisle Corp.,* 529 F.2d 614 (3d Cir. 1976). In *Gore,* the plaintiff's complaint alleged infringement by the defendant of plaintiff's patents. The defendant's answer denied the validity of the patents, asserted that one of the plaintiff's patents was unenforceable because of fraud in its procurement, and counterclaimed for damages based on the plaintiff's alleged violation of the Sherman Act. After a trial, the district court entered a judgment holding one of the patents valid and infringed and the other patent invalid, granting the plaintiff an injunction restraining the defendant from infringing the patent and determining that the plaintiff had violated the Sherman Act. The judgment postponed until a later date the accounting for the infringement and the determination of damages for the antitrust violation. Both parties appealed from that judgment.

The Court in *Gore* carefully reviewed all the possible sources of jurisdiction. Section 1291 of Title 28 was rejected because the district court's judgment was interlocutory, not final. *See also Liberty Mutual Life Ins. Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). Section 1292(a)(4) which confers jurisdiction to review "judgments in civil actions for patent infringement which are final except for accounting," was eliminated as a source of jurisdiction because the district court judgment did not include a full and final adjudication of the defendant's antitrust counterclaim. That left only section 1292(a)(1).

Section 1292(a)(1) of Title 28 confers jurisdiction upon the courts of appeals to review:

> Interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve injunctions, except where a direct review may be had in the Supreme Court.

The district court in *Gore* both granted and denied injunctions and § 1292(a)(1) thus conferred jurisdiction on the court of appeals. But as Judge Maris explained, the jurisdiction conferred by § 1292(a)(1) was of limited scope:

When, as in the patent infringement case now before us, an injunction against future infringement is sought and is either granted or refused in the judgment determining the issues of validity and infringement, the portion of that judgment granting or denying the injunction becomes appealable under § 1292(a)(1) as an interlocutory order. And since the propriety of granting or denying the injunction normally depends upon the correctness of the district court's determination of the underlying issues of validity and infringement, so much of the judgment as determined these issues is necessarily reviewable on such an appeal. In such a situation, however, the jurisdiction conferred upon the court of appeals does not extend *to other claims or issues* determined by the judgment *which have no bearing upon the propriety of the action of the court with respect to the injunction.*

529 F.2d at 617–18 (citations deleted and emphasis added). These principles apply with equal force to the instant case.

The district court order in the case *sub judice,* even more than in *Gore,* leaves important issues untried: Paeco's liability for antitrust violations, damages for antitrust violations, and the amount of attorneys' fees. Thus, the order is interlocutory, not final, and not appealable under § 1291. As in *Gore,* § 1292(a)(4) is also inapplicable since the antitrust claims have yet to be determined. Our jurisdiction is therefore founded exclusively on § 1292(a)(1).

The lesson of *Gore* is that § 1292(a)(1) gives us jurisdiction to review only so much of the district court's order as determined the issues of patent validity upon which 'the district court based the denial of an injunction. The issues we have already discussed—the validity of Claims 1, 2 and 3 under 35 U.S.C. §§ 102(a) and (b)—are clearly reviewable, for the district court's determination of those issues forms the basis of its denial of injunctive relief to Paeco. On the other hand, that part of the district court order awarding attorney fees to AMI

is clearly not reviewable; the award of such fees, and, indeed, the underlying determination that this was an "exceptional" case, was irrelevant to the district court's denial of injunctive relief.

The district court's holding that Paeco's conduct in prosecuting the patent was unfair and inequitable is also not reviewable at this time under § 1292(a)(1). Paeco points out that in declining to hold the entire patent invalid for fraud on the patent office, the district court stated that the more appropriate sanction for Paeco's misconduct was "to weaken the statutory presumption of validity normally cloaking a patent." Paeco argues that the district court's determination on the issue of fraud and misconduct thus served as a basis for holding Claims 1, 2 and 3 invalid under §§ 102(a) and (b). This argument finds sufficient answer in the words of the district court opinion immediately following the sentence which Paeco quotes:

> We find and conclude the patent to be invalid on statutory grounds distinct and separate from the allegations of fraud. Additionally, with full recognition of the heavy burden on defendants of proving invalidity, we conclude that such burden has been met by a preponderance of the evidence. Thus, were it to be determined that we have erred in this fraud determination, sufficient evidence has been independently adduced in this proceeding by defendants to otherwise prove invalidity.

In light of this statement by the district court, it cannot be said that the district court's denial of an injunction was dependent on its determination as to fraud and Paeco's argument plainly has no merit. Furthermore, for the same reasons that we lack jurisdiction over Paeco's appeal from the district court's determination as to fraud, we also lack jurisdiction to consider AMI's appeal from another element of that same determination. Accordingly, we will not now consider either the award of attorneys' fees or the district court's determination on the issue of fraud.

## IV.

For the foregoing reasons, the appeal in No. 76–1496 will be dismissed for lack of jurisdiction. The order of the district court in No. 76–1495 holding Claims 1, 2 and 3 invalid under section 102(b) will be affirmed; the order holding Claims 1, 2 and 3 invalid under section 102(a) will be reversed; and the appeal from the remainder of the district court's order will be dismissed for lack of jurisdiction. The case will be remanded to the district court for further proceedings not inconsistent with this opinion.

Costs shall be taxed against the appellant in each case.